UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA                          :
                                                  :
                                                  :          08 CR 1327 (HB)
            - against -                           :
                                                  :          OPINION &
                                                  :          ORDER
                                                  :
ROMAN ZADIRIYEV                                   :
                                                  :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Defendant Roman Zadiriyev ("Zadiriyev") is one of fourteen defendants charged in a five-count indictment with conspiracy to violate the Hobbs Act, 18 U.S.C. §1951, for alleged participation in a conspiracy to hijack federal express trucks on the west side of Manhattan. Zadiriyev moves to suppress physical evidence, including a handgun, ammunition, and police paraphernalia, recovered by the Government in the course of a search of his apartment that followed his arrest on December 5, 2008. In his moving papers, as well as at an evidentiary hearing held on April 7, 2009, Zadiriyev contends principally that he did not consent to the search. For the following reasons Zadiriyev's motion is DENIED.

## I.     BACKGROUND

      On the morning of December 5, 2008 and with a warrant for his arrest but no search warrant, a team of eight FBI special agents and NYPD officers set up surveillance on Zadiriyev's apartment in Brooklyn, New York hoping to arrest him as he exited his home. (Tr. of Apr. 7, 2009 Hrg. ("Tr.") 98: 21-23.) At approximately 2:00 P.M., when had not left the apartment, the arrest team approached the front door and knocked. (Tr. 44: 4-6.) Zadiriyev answered the door and FBI Special Agent Peter Casson ("Casson"), identified himself, informed Zadiriyev of the charges on which he was being arrested, and placed Zadiriyev under arrest in the threshold. (Tr. 44: 1-8.) Zadiriyev was then brought a few steps out of the apartment and placed in handcuffs, at which point Casson asked Zadiriyev if he would mind if they moved back into the apartment to avoid creating a "spectacle" for the neighbors. (Tr. 45: 7-9; 64: 2-7.) Zadiriyev agreed. (Tr. 64: 23.)

As Zadiriyev was detained by Casson and another member of the arrest team in the front hallway of the apartment, the balance of the law enforcement officers filed into the apartment to conduct a protective sweep.  (Tr. 75: 21-23; 133: 1-14.)  As two of the agents headed towards the bedroom at the rear of the apartment, Zadiriyev's wife, Yekaterina Zapravdina ("Zapravdina"), appeared in the doorway to the bedroom.  (Tr.100: 1-2.)  One of the agents, Dawn Tomazich ("Tomazich"), stopped to speak with Zapravdina as the other, Thomas Duane ("Duane"), continued to conduct a safety sweep of the bedroom. (Tr. 100; 1-4; 142-43.)  Once Duane had completed the protective sweep of the bedroom, he and Tomazich spoke with Zapravdina in the bedroom.  (Tr. 100: 1-15; 109-110.)  The other members of the arrest team concluded the sweep of the balance of the apartment and, having determined that no one else was present, they relayed an "all clear" signal.  (Tr. 75: 14-18.)

At this point, accounts of the arrest diverge.  At the suppression hearing, Casson testified to the following account.  Once the protective sweep was complete, he asked Zadiriyev if the agents could search the apartment and Zadiriyev clearly indicated his consent.  (Tr. 75: 23-25; 77: 19-21.)  Casson then presented Zadiriyev with an FBI form to acknowledge his consent in writing, but Zadiriyev refused to sign it.  (Tr. 46: 12-16.)  Casson explained that the purpose of the form was to document in writing the consent that Zadiriyev had provided verbally and that if Zadiriyev did not consent to a search of the apartment the agents would apply for a search warrant.  (Tr. 46: 17-21.)  Zadiriyev responded that the agents would then need to obtain a warrant. (46: 24-25; 47: 1-2.)  Casson told Zadiriyev that was fine, but that the agents would need to secure the apartment for a few hours while they applied for a warrant, and if that if Zadiriyev had nothing to hide it would be easier for everyone if he consented to the search.  (Tr. 47: 3-10.)  Zadiriyev then re-acknowledged his earlier consent by replying to the effect of, "okay, fine, search what you want . . . I just don't want to sign anything."  (Tr. 47:11-13.) Special Agent Casson signed the consent to search form that he had shown to Zadiriyev, adding the notation "refused to sign but gave verbal consent." (Govt. Ex. 1; 92: 7-10.)  Casson then instructed the arrest team to commence a search of the apartment. (Tr. 92: 11-18.)

On the issue of consent, the account offered by Zadiriyev in a sworn declaration differs substantially.  First, Zadiriyev contends that before he was asked to consent to a search an agent approached him and asked questions about an emergency medical technician's badge ("EMT badge") and other items that comprised the contents of Zadiriyev's wallet.  (Declaration of

2

Roman Zadiriyev, dated Mar. 28, 2009 ("Zadiriyev Decl."), at 2.)  Zadiriyev further states that thereafter he unequivocally told the agents that he did not consent to a search of the apartment and that he refused to speak with the officers without his attorney present.  (Id.)

Following his conversation with Zadiriyev, Casson instructed Duane to retrieve a camera, gloves, and evidence bags from his car.  (Tr. 133: 23-25; 134: 1-13.)  While Zadiriyev remained in the agents' custody in the hallway, Casson searched the living room and Duane searched the bedroom.  (Tr. 134: 9-13.)  During the search Zadiriyev and Zapravdina spoke in Russian and, according to Duane and Tomazich, after one of the exchanges Zapravdina told the officers to keep searching, but that she would not sign anything.  (Tr.116: 3-12; 135: 1-20.)   The search ultimately produced the following items, which were seized as evidence:  Zadiriyev's wallet including the EMT badge from a table in the hallway, a handgun and ammunition found by Duane in a drawer in a bedside table in the bedroom, a hat and t-shirt bearing police insignias found in a closet in the hallway, three bee-bee guns, two cellular phones, a CB radio, papers containing a list of names and telephone numbers and a NYPD photographic line up sheet.  (GX-2.)

Zapravdina's account of the arrest and subsequent search, offered in both a sworn declaration and live testimony, varies from the agents' accounts only in a few discrete respects but suffers from significant deficiencies in terms of credibility.  The declaration signed and submitted to the Court bears the name Yekaterina Zadiriyeva, although Zapravdina acknowledged on the stand that she has neither taken nor ever used her husband's surname. (Tr. 152: 15-19.)   The declaration also references a memorandum of law in a paragraph Zapravdina attributed to her husband's lawyers and declared that she had never seen the items of evidence shown to her after the search, although she admitted on the stand that she had seen the bee-bee guns before.  (Tr. 166-67; 183-84.)  In any event, Zapravdina's testimony sheds little light on the central factual question—whether Zadiriyev verbally consented to the search—because although she testified that she never heard her husband provide consent, neither did she hear him refuse it.  (Tr. 164: 17-25; 165: 1.)  Zapravdina testified that she tried to pay attention to the conversation between her husband and the agents who detained him in the hallway, and that she heard them talking about sports and joking.  (164: 9-24.)  She did not, however, understand the exchange between Zadiriyev and the agents when they first entered the apartment.  (Tr. 178-179.)  Zapravdina acknowledges that she spoke with her husband in Russian as the agents

3

conducted their search, contending that Zadiriyev spoke to her to calm her, and told her that the agents did not have a search warrant, that they would leave soon, and that she should sign nothing. (Tr. 162: 1-7.)

## II. DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ...." U.S. CONST. AM. IV. A warrantless search is *per se* unreasonable unless one of a "'few specifically established and well-delineated exceptions" applies. Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

### A. Protective Sweep

Zadiriyev first contends that by forcing him to retreat back into the apartment after the arrest, the special agents "manufactured" circumstances that would require a "protective sweep" in the hope of uncovering evidence. (See Deft.'s Post-Hrg. Br. at 3.) A protective sweep is a "cursory visual inspection of those places in which a person might be hiding" to protect the safety of law enforcement officers conducting an arrest, and represents a well-established exception to the general rule against warrantless searches. Maryland v. Buie, 494 U.S. 325, 327 (1990). To be lawful, however, an officer who conducts a protective sweep must have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to those on the arrest scene." Id. at 334. (internal citations and quotation marks omitted).

Although the Government may not manufacture or contrive exigent circumstances to conduct a protective sweep that is a pretext for a search for evidence, see, e.g., United States v. MacDonald, 916 F.2d 766, 772 (2d Cir. 1990) (discussing United States v. Segura, 663 F.2d 411, 415 (2d Cir.1981)); United States v. Isofia, 02 Cr. 520 (HB), 2003 WL 21018853 (S.D.N.Y. May 5, 2003), aff'd United States v. Isofia, 370 F.3d 226 (2d Cir. 2004), an arrest outside of a dwelling may justify a protective sweep of the dwelling if the arresting officers have a reasonable belief that dangers lurk in the home. United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990). In such circumstances, a protective sweep is lawful if the arresting officers have a reasonable belief that (1) third persons are inside, and (2) the third persons are aware of the arrest outside such that they "might destroy evidence, escape or jeopardize the safety of the officers or

4

the public.'" Id. (quoting United States v. Vasquez, 638 F.2d 507, 531 (2d Cir. 1980). In Oguns, officers arrested a defendant who was prepared to receive a delivery of heroin in the front yard of the apartment building where he lived. Oguns, 921 F.2d at 445. After noticing an open door to an apartment inside the building and confirming that it was the defendant's apartment, the officers conducted a security sweep of that apartment. Id. at. 445. The Second Circuit held that the security sweep met the Fourth Amendment requirements of Buie and Vasquez because the arresting agents could have reasonably believed that others were in the apartment when the arrest was made and that those inside could have observed the arrest through the open door and consequently acted to jeopardize the agent's safety or destroy relevant evidence. Id. at 446-47.

Here, the arrest team knew that Zadiriyev was wanted for his alleged participation in a series of violent, gun point robberies and thus it would have been reasonable for them to believe that Zadiriyev or others in his apartment were dangerous. Once they effectuated the arrest on the threshold, the potential dangers to the officers did not end. As Duane testified, "as we are in the entrance of the doorway, if there is someone in there who is posing a threat to us, they could very easily take a shot at us with a handgun from one of the rooms or do something else." (Tr. 17-20.) Ms. Zapravdina's testimony that she heard the commotion of the arrest from the bedroom confirms the special agents' reasonable belief that persons inside the apartment could be aware of the arrest occurring just outside of it. (Tr. 155: 4-5.) The arresting agents would thus have been justified in conducting a protective sweep of the apartment regardless of whether Zadiriyev agreed to step back into the apartment following his arrest. Consequently, Zadiriyev's argument that the agents moved Zadiriyev into the apartment to justify a protective sweep lacks merit.

**B. Consent to Search**

A warrantless search conducted pursuant to valid consent is another well-established exception to the general prohibition on warrantless searches. See United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (citing Schneckloth, 412 U.S. at 219)). To determine whether the search of Zadiriyev's apartment was made pursuant to valid consent I must decide two issues: first, whether Zadiriyev in fact provided Casson with verbal consent to search the apartment, and, if so, whether such consent was voluntary.[1]

---

[1] Zadiriyev takes issue with the fact that Casson's post-arrest report indicates that the arresting agents received consent to search from both Zadiriyev and his wife but that neither Duane nor Tomazich testified that they asked Ms. Zapravdina for consent to search. (Deft.'s Post-Hrg. Mem. at 4.) The statement in the report, however, is easily explained by the consistent testimony of both Duane and Tomazich that Ms.

5

**1. Zadiriyev Verbally Consented to the Search**

Because the Fourth Amendment only prohibits unreasonable searches and the issue of reasonableness is to be measured by an objective standard, in the context of a purported consent to search "the ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (quoting United States v. Sanchez, 32 F.3d 1330, 1335-36 (8th Cir. 1994)). Whether Zadiriyev verbally consented to the search turns on a credibility determination. Agent Casson testified that Zadiriyev clearly verbalized his consent to search the apartment, both before refusing to sign the consent form and after Casson informed him that if he maintained his refusal to consent the agents would apply for a warrant. (Tr. 77: 15-23.) In contrast, in his sworn declaration Zadiriyev states that he unequivocally told the agents that he did not consent to a search. (Zadiriyev Decl. at 2.)

Other than Casson, none of the witnesses who testified at the suppression hearing heard Zadiriyev provide consent. Agents Duane and Tomazich, however, each testified that they were advised by members of the arrest team that Zadiriyev had consented to a search. Casson's account is further corroborated by the consent to search form which Casson contemporaneously marked "refused to sign but gave verbal consent," (GX-1), and the report that he later prepared. (DX-B.) Furthermore, the testimony offered by both Duane and Tomazich that, after speaking in Russian with her husband, Zapravdina told them to "keep searching" but that she would not sign anything corresponds with the account Casson consistently attributes to Zadiriyev: that he was willing to provide verbal consent to search but not to sign any documentation.

To the extent it is to be believed, Ms. Zapravdina's testimony does not significantly undermine that provided by Casson. Although Zapravdina testified on direct that she tried to "pay attention" to the conversation between Zadiriyev and the agents detaining him near the door and that she heard them joking and talking about sports, she testified that she did not hear anyone ask him to provide consent. (Tr. 164: 7-21.) Zapravdina did not testify that she heard her husband decline to consent to a search. On cross examination, Ms. Zapravdina acknowledged that she could not understand what was said between the agents and her husband shortly after he

---

Zapravdina told the officers to "keep searching" without being prompted—ratifying the consent provided by her husband without being asked to do so. (Tr.116: 3-12; 135: 1-20.)

6

was led into the apartment—the time period during which Casson contends that Zadiriyev consented to the search.  (Tr. 178-179.)

I have no reason to doubt the credibility of Agent Casson's testimony, which is corroborated by the consent to search form, his written report, and, albeit obliquely, the testimony of other agents.  In contrast, Zadiriyev's motivation to change his story and deny that he ever consented to the search is readily apparent.  I credit Casson's account and find that Zadiriyev provided verbal consent to search the apartment despite Zadiriyev's more recent protestations to the contrary.

**2. Zadiriyev's Consent Was Voluntary.**

The Government has the burden of proving, by a preponderance of the evidence, that the agents had a reasonable belief that Zadiriyev's consent to search was voluntary.  Isiofia, 370 F.2d at 230-31 (citing United States v. Calvente, 722 F.2 1019, 1023 (2d Cir. 1983)).  Determination of whether consent is valid is a "question of fact to be determined by the 'totality of all the circumstances.'"  United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (quoting Schneckloth, 412 U.S. at 227). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority."[2] Id. (internal citations omitted). "[K]nowledge of the right to refuse consent is not a requirement of a finding of voluntariness, though it may be a factor in ascertaining whether the consent was coerced."  Garcia, 56 F.3d at 422 (citing United States v. Kon Yu-Leung, 910 F.2d 33, 40-41 (2d Cir. 1990)).  A voluntary consent may follow formal arrest, United States v. Watson, 423 U.S. 411, 424 (1976); United States v. Moreno, 897 F.2d 26, 33 (2d Cir.), cert denied 497 U.S. 1009 (1990), and the Second Circuit has affirmed the voluntariness of consent provided by a handcuffed suspect to six law enforcement officers who entered his home in the early morning hours and who assured him that if he refused to consent to a search they would remain there until a warrant was obtained.  Kon Yu-Leung, 910 F.2d at 40-41.  Conversely, this Court has held invalid purported consent offered only minutes after police made an illegal entry into the home of a suspect who was not a native

---

[2] However, "the concept of a knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial does not govern in the Fourth Amendment context . . . because the Fourth Amendment prohibits not all searches and seizures, but only those that are 'unreasonable.'"  Garcia, 56 F.3d at 422 (citing Illinois v. Rodriguez, 497 U.S. 177, 183 (1990) (internal citations omitted).  Thus, a consent to search must be "voluntary" but it need not be "knowing" and "intelligent" in the same way that, for example, a defendant's waiver of his trial counsel's conflicts must be. See, e.g., United States v. Curcio, 680 F.2d 881, 885 (2d Cir. 1982).

English-speaker and who was not advised of the charges against him, the type of evidence sought, or his right to refuse consent.  United States v. Isofia, 02 Cr. 520 (HB), 2003 WL 21018853, (S.D.N.Y. May 5, 2003), aff'd. United States v. Isofia, 370 F.3d 226 (2d Cir. 2004).

      Based upon a totality of the facts presented by the declarations and the testimony at the suppression hearing, I conclude that it was objectively reasonable for the arresting agents to conclude that Zadiriyev's consent was voluntary and not "a mere acquiescence in a show of authority."  Wilson, 11 F.3d at 351.  First, Casson's testimony, which I find credible, suggests that Zadiriyev's initial reaction was to permit the officers to search and it was only after he was asked to acknowledge the consent in writing that he expressed any hesitation.  Second, once the alternatives were clearly explained to him—that he could either provide consent or the agents would apply for a warrant—Zadiriyev reiterated his consent but maintained his position that he would not sign any documents.  The consistency of Mr. Zadiriyev's position after being apprised of his right to refuse consent supports the objective reasonableness of Casson's conclusion that the consent was valid.  Third, Agent Tomazich's testimony that after speaking with her husband in Russian Ms. Zapravdina informed the agents that they could continue searching but that she would not sign any documents corroborates the position that Casson consistently attributes to Zadiriyev.  (Tr. 101: 5-15.)

      Fourth, nothing in the record before me indicates that Zadiriyev was overcome with fear or otherwise prevented from making free choices based upon the circumstances of his arrest.  Indeed, his wife testified that he joked and discussed sports with the arresting officers, which dovetails with the somewhat cavalier tone of the responses that Casson attributes to him:  e.g. "search, take what you want; I don't care, search."  (Tr. 77: 19-21.)  Fourth, Casson testified that Zadiriyev communicated clearly in English.  (Tr. 53: 16-25; 54: 1-5.)  Fifth, having concluded, supra, that it was both lawful for the agents to enter the apartment and conduct a protective sweep and standard practice for them to do so, Zadiriyev's arrest does not present a situation where the government must wait for the taint of unlawful actions to sufficiently dissipate before a consent can be properly considered to be freely given.  See, e.g., United States v. Snype, 441 F.3d 119, 135 (2d Cir. 2006).  In short, the totality of the credible testimony clearly supports the objective reasonableness of Casson's belief that Zadiriyev's consent was voluntary and therefore valid.

8

**C. Recovery of Evidence**

The final issue that I must decide is whether the evidence that Zadiriyev seeks to suppress was validly recovered during the search that followed Zadiriyev's consent, or whether it was improperly recovered in the course of the agents' protective sweep that preceded that consent. Testimony was offered at the hearing about recovery of (i) a handgun from a bedside table in the bedroom; (ii) the contents of Zadiriyev's wallet, including an EMT badge, from a dresser in the hallway; and (iii) t-shirts and hats from a closet in the hallway of the apartment.[3] In each instance, the credible testimony establishes that these items were recovered during the lawful search that followed Zadiriyev's verbal consent.

First, Duane testified that he recovered the gun from the bedroom in the latter part of the search, after he had gone to his car to retrieve a camera and other equipment necessary to conduct the search. (Tr. 134: 1-6; 136:19-22.) Tomazich testified that she was in the bedroom with Zapravdina when the agents received notice that they had consent to search but that she left the room before Duane recovered the handgun, which corroborates Duane's testimony that he did not recover the gun during the protective sweep. (Tr. 114:20-25; 115:1-16.)

Second, Casson testified that Zadiriyev's wallet was the first item of evidence recovered after the agents received consent to search, as it was found on top of a dresser in the hallway where Zadiriyev was detained. (Tr. 93: 19-25; 94:1-3.) In contrast, in his declaration Zadiriyev states that he was approached by agents holding the contents of his wallet before he was asked to provide consent to search. Since I find Casson's testimony to be more credible than Zadiriyev's self-serving declaration, I conclude that the wallet was recovered after Zadiriyev provided consent to search the apartment.

---

[3] The Court heard testimony that Duane and Tomazich asked Zapravdina for her husband's identification and she offered to provide them with a passport. (Tr. 180-181.) When Zapravdina began to search through a drawer in the bedroom for the document, Duane and Tomavich stopped her, preferring for safety reasons to retrieve the document themselves. Although the testimony suggests that the agents may have retrieved the passport before Zadiriyev provided consent to search the apartment, no passport is among the evidence seized here and is thus not evidence to be suppressed. In any event, despite some minor discrepancies as to whether Zapravdina sought to recover her own passport or her husband's, and from which bedside table, the testimony is clear that Zapravdina offered to provide the passport to the agents in response to their valid questions concerning her identity and that of her husband. (Tr. 180-81; see, Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."))

Third, and finally, Zapravdina offered somewhat ambiguous testimony that as the agents filed into the apartment they immediately began to open closets and look through the shelves, including the hallway closet from which the t-shirts and hats were recovered. (Tr. 159-160.) Her testimony was clearly geared, if not tailored, to help her husband but resulted in a narrative that lacked credibility. Her testimony is belied by, among other things, the testimony of Tomazich to the effect that Zapravdina pointed out the closet in the hallway where Zadiriyev's clothing was stored after the protective sweep was complete. (Tr. 102: 8-12.) In addition to the credibility issues that undermine Zapravdina's testimony as a general matter, it is entirely plausible that she confused the initial protective sweep—during which the agents acknowledged they opened closets to determine that there were no persons hiding therein—with the consent search that followed quickly on the heels of the sweep. In any event, nothing in the record before me suggests that the items recovered from the hallway closet were recovered prior to Zadiriyev's verbal consent to search, which occurred within the first five minutes of the agents' entry into the apartment. (Tr. 69: 5-8.) A preponderance of the credible evidence establishes that the physical evidence Zadiriyev seeks to suppress was recovered during the agents' valid search of the apartment, not the protective sweep that preceded it.

### III. CONCLUSION

For the foregoing reasons, Zadiriyev's motion to suppress the physical evidence obtained by the Government pursuant to their search of his apartment on the day of his arrest is DENIED.

SO ORDERED
April 1⟨⟩ , 2009
New York, New York

_____
U.S.D.J.

10